**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| SGIC STRATEGIC GLOBAL INVESTMENT CAPITAL, INC. , GRIL GERMAN RESTAURANT INVESTMENT AND LENDING, INC., AND CHRISTIAN GROENKE, | § § § § § § | |
| Plaintiffs, | § § | |
| v. | § § | Civil Action No. _____ |
| BURGER KING EUROPE GMBH, | § § | |
| Defendant. | § § | |

## <u>ORIGINAL COMPLAINT</u>

Plaintiffs SGIC Strategic Global Investment Capital, Inc., GRIL German Restaurant Investment and Lending, Inc., and Christian Groenke file this Original Complaint against Burger King Europe GmbH seeking the recovery of damages and declaratory relief, and in support thereof state the following:

## PARTIES

1.     SGIC Strategic Global Investment Capital, Inc. ("SGIC") is a Delaware corporation with its principal place of business in Dallas, Texas.  Christian Groenke is the sole shareholder and serves as SGIC's president.  Christian Groenke is a citizen of the United States and a resident of Texas.

2.     GRIL German Restaurant Investment & Lending, Inc. ("GRIL") is a Delaware corporation with its principal place of business in Dallas, Texas.  SGIC is the sole shareholder of GRIL.

3.     Christian Groenke ("Groenke) is a citizen and a resident of the state of Texas.

4.     Burger King Europe GmbH ("BKE) is a Swiss entity with its principal place of business in Zug, Switzerland. BKE is an indirect subsidiary of Burger King Worldwide Inc., which has its principal place of business in Miami, Florida.  BK Worldwide is publicly traded on the New York Stock Exchange under the ticker symbol BKW.  Pursuant to Federal Rules of Civil Procedure 4(h)(2) and 4(f), BKE may be served with process under the procedures established by the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil and Commercial Matters, better known as the Hague Convention, to which Switzerland is a signatory.

**JURISDICTION AND VENUE**

5.     This court has jurisdiction over this action based on 28 U.S.C. § 1332 because the plaintiffs are citizens of  the State of Texas, on the one hand, and the defendant is a citizen or subject of a foreign state, on the other hand, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

6.     Venue is proper in the Northern District of Texas under 28 U.S.C. § 1391(b)(1)-(2). In the alternative, venue is proper in the Northern District of Texas under 28 U.S.C. § 1391(b)(3) and (c)(3).

7.     This Court has personal jurisdiction over BKE because it has purposefully availed itself of the benefits and protections of this forum by filing a lawsuit against Groenke on April 17, 2014, Civil Action No. 3:14-cv-01417, *Burger King Europe, GmbH v. Christian Groenke*, pending in the United States District Court for the Northern District of Texas, Dallas Division (the "Franchise Fees Action"). In the Franchise Fees Action, BKE is seeking to recover on a written guarantee relating to the same general transactions at issue in this action.  In addition,

48789739.1

BKE's contacts with the Northern District of Texas and the plaintiffs have been continuous and systematic.

## INTRODUCTION

8.     The claims asserted by BKE against Groenke in the Franchise Fees Action, in which BKE is seeking to recover on a guarantee relating to certain franchised Burger King restaurants, are just part of a much larger dispute between SGIC, GRIL, Groenke and BKE. In 2010, BKE induced Groenke, through one of his companies, to acquire the shares of the corporation that owned BKE's nonperforming restaurants in Berlin in exchange for numerous promises. One of those promises was that BKE would give and honor a development agreement for the Berlin market region. The other was that BKE's remaining German restaurants would also later be "refranchised" and sold. BKE not only failed to perform as promised, it then engaged in a course of conduct designed to devalue Groenke's performing restaurants and prohibit the previously agreed upon expansion.

9.     Eventually, the nonperforming restaurants had to be placed into an insolvency proceeding. When BKE was offered an opportunity to recover the franchise fees for these restaurants – the ones it now seeks in the Franchise Fee Action - it rejected the offer.  Instead, BKE sold its German restaurants to a competing franchisee and wrongfully terminated the development agreement. When SGIC sought to sell its shares in GRIL, *which did not directly own or operate any Burger King restaurants and is not a Burger King franchisee*, BKE threatened the buyer, effectively stopping the sale when BKE had no contractual or legal right to do so. This conduct significantly harmed SGIC, GRIL and Groenke.  BKE then filed the Franchise Fee Action in this district seeking to recover the franchise fees from Groenke.

## FACTS

### A.     The German Franchisees

10.     Beginning in 1997, Groenke became involved in owning and operating Burger King franchises in Germany through a company that later became known as HEGO System-Gastronomie GmbH & Co. KG ("HEGO"). HEGO owned some Burger King franchises.  It also owned and controlled a number of separate German subsidiaries that owned individual Burger King restaurants.  HEGO and the subsidiaries were parties to franchise agreements with BKE.

11.     The franchise agreements required the franchisees to pay certain franchise fees to BKE.  The payment of the franchise fees was originally backed by a letter of credit with a German bank.  Groenke later substituted his personal guarantee for the letter of credit.

12.     The Burger King restaurants that HEGO and its subsidiaries operated generally performed well financially. HEGO was rapidly expanding its investment into the Burger King franchise system.

13.     HEGO and its subsidiaries later became wholly owned subsidiaries of another German company, SAVE Vermogensverwaltungs GmbH & Co., Holding KG ("SAVE").

### B.     The Burger King Corporate Stores

14.     In addition to BKE being a franchisor, BKE also operated restaurants in Germany that BKE owned through subsidiaries. BKE operated these restaurants through various subsidiaries, including Burger King GmbH Berlin ("BK Berlin"). BK Berlin's parent was Burger King Beteiligungs GmbH. The parent and BK Berlin had entered into a profit transfer agreement. Under German law, the parent was required to satisfy BK Berlin's losses.  By 2010, BK Berlin was incurring heavy losses, averaging about €2.5 million (euros) annually. In order to reduce the losses, BK Berlin and its parent wanted to convert the BKE-owned restaurants to franchised

restaurants. BKE and its representatives approached Groenke about acquiring the BKE-owned restaurants.

15.     Groenke engaged in extended discussions with representatives of BK Berlin and Burger King Beteiligungs GmbH regarding the BKE-owned restaurants.   Groenke also negotiated with Jonathan Fitzpatrick, who was the President of Burger King's EMEA Region. The EMEA Region encompasses Europe, the Middle East, and Africa.  In June of 2010, Groenke agreed that SAVE would purchase all the shares of BK Berlin. In return, HEGO would receive two things.

16.     First, HEGO would receive an exclusive five-year development agreement for the greater Berlin market region.  That development agreement could be extended for another five years. The development agreement permitted HEGO to develop a minimum of 38 restaurants over ten years.  Second, Jonathan Fitzpatrick of BKE expressly promised Groenke and HEGO that they would be given the first opportunity to buy the other 91 restaurants BKE and its affiliates still owned and operated in Germany when they were sold as a franchise opportunity. The sale of these additional restaurants would later become known as "Project Duck."  The sale of the 91 restaurants would also be paired with a development agreement for all of Germany. This promise was reaffirmed to Groenke by Fitzpatrick at a dinner at the China Club in Berlin.

17.     As part of this same transaction, Groenke executed a guarantee related to the franchise agreements with BKE. Through this guarantee, Groenke personally guaranteed the payment of franchise fees by restaurants owned by HEGO and its affiliates.  The guarantee was limited to €50,000 (euros) per restaurant. This guarantee forms the basis of the claims BKE has brought in the Franchise Fee Action.  The payment of these franchise fees had originally been backed by a letter of credit issued by a German bank.  Groenke would not have eliminated the

letter of credit and personally guaranteed the franchise fee obligations of HEGO and its affiliates if he had known that BKE would renege on its commitments.

## C.     The Burger King Franchise and Corporate Stores are Not Owned by SGIC or GRIL

18.     After SAVE purchased all the shares of BK Berlin, SAVE was renamed BK HEGO-SAGRO Holding GmbH & Co. KG ("SAGRO"). Through a series of mergers and restructurings, American Restaurant Holding, LP ("ARH") became the successor in interest to SAGRO.  ARH is 100% owned by GRIL.  GRIL is 100% owned by SGIC.  SGIC is a sub-chapter S corporation.  Groenke is the sole shareholder of SGIC.

## D.     BK91

19.     Just five months after SAVE purchased BK Berlin, Groenke flew to Barcelona, Spain to attend the Burger King European convention. At the convention, Groenke met with Fitzpatrick and the CEO of Burger King's US parent company, Bernardo Hees. At that meeting, Fitzpatrick recommended to Hees, as he had previously promised to Groenke, that SAGRO purchase the remaining 91 Burger King corporate restaurants in Germany and that they be operated as franchises. Hees agreed. Based on these statements, SAGRO reasonably believed that the "BK91" transaction would occur.  SAGRO began preparing for the acquisition of the 91 restaurants by, among other things, adding office space, creating additional classrooms for training and increasing staff, including adding a development department.

20.     At the end of 2010, Fitzpatrick left Burger King and was replaced by Jose Cil, who became president of the EMEA Region. After Cil took over, he failed to perform as Fitzpatrick and Hees had previously agreed.  Cil refused to sell the 91 restaurants to SAGRO. Cil cited, among other things, the low value of the restaurants.

48789739.1

**E.      Hanover & Project Duck**

21.      Seeking to further expand in Germany, in March of 2011, HEGO signed a letter of intent with Baum Holding GmbH ("Baum") to purchase Baum's Burger King franchises in Hanover.  When HEGO informed BKE about the potential transaction, it sent correspondence to Baum claiming HEGO was not "equipped" to operate the 25 Hanover restaurants.  HEGO's acquisition of the Baum restaurants would have more than fulfilled the requirements of the development agreement for the opening of new restaurants.

22.      Just one month later, in September of 2011, BKE invited Groenke to meet with Cil to discuss what eventually became known as "Project Duck" –the sale of the remaining 91 BKE restaurants in Germany with a new development agreement for the entire German market.  A letter of intent was executed. HEGO negotiated with a third party to provide capital for the acquisition of the 91 restaurants.  When BKE learned that HEGO was negotiating with this third party, BKE went behind HEGO's back and began negotiating on its own with the third party to purchase the restaurants.  BKE's actions thwarted any purchase of the 91 restaurants by HEGO.

23.      With both Hanover and Project Duck thwarted by BKE, and the BK Berlin restaurants continuing to suffer losses, BK Berlin was forced to file for bankruptcy protection in October of 2012 under German law.

**F.      The BK Berlin Bankruptcy, Termination of the Agreement and Sale to Yi-Ko**

24.      In December 2012, HEGO offered to BKE to acquire the former BK Berlin restaurants from the court appointed bankruptcy trustee.  HEGO believed that the reduction of the leases and costs through the bankruptcy would have allowed the nonperforming restaurants to operate profitably. HEGO's offer ensured that BKE would be paid all franchisee fees owed by the BK Berlin restaurants. BKE refused HEGO's offer.

25.     About the same time, in early 2013, BKE terminated the development agreement with HEGO.  BKE terminated the development agreement even though the initial five year term had not expired, HEGO and its subsidiary franchisees were not in bankruptcy, and the Hanover transaction would have more than fulfilled the openings of new restaurants required by the development agreement.

26.     In May of 2013, BKE sold the 91 restaurants it owned to Yi-Ko Holding GmbH ("Yi-Ko"). This entity, based on information and belief, is owned or controlled by Ergün Yildiz and Alexander Kolobov.  Through various entities, Yildiz and Kolobov owned or controlled Burger King restaurants in Germany and Russia. Yi-Ko also received a development agreement for the southern region of Germany.  Because HEGO no longer had a development agreement or the opportunity to purchase BKE's 91 restaurants as originally promised, and because of the deteriorating German Burger King market, for which BKE was responsible, Groenke decided to exit the German Burger King market.

### G.     SGIC Decides to Sell its Interests in GRIL

27.     Because of tax implications and other considerations, it was in SGIC's best interest to sell its member interests in GRIL, as opposed to a sale of the equity interests in HEGO or a sale of HEGO's underlying assets.  SGIC disclosed this to BK Corporation and BKE on several occasions, although it had no legal or contractual obligation to do so.

28.     On October 9, 2013, SGIC informed BK Corporation's CEO, Daniel Schwartz, that SGIC intended to sell its equity interests in GRIL.  SGIC invited BK Corporation to help it identify potential buyers.  SGIC sent a standard confidentiality agreement to BK Corporation for it to forward to potential buyers.

**H.      BKE Recommends Kolobov and Yildiz as Potential Buyers**

29.      Around this time, BKE was working with HEGO to identify potential buyers. HEGO's chief financial officer, Stephan Pachur, had several conversations with a BKE employee, Andreas Bork.  At the time, Bork was in charge of BKE's DACH Region. The DACH Region encompasses German, Austria and Switzerland.   Bork suggested several parties that SGIC should contact regarding a possible sale of its interests in GRIL.   Among the parties that Bork suggested were Kolobov and Yildiz.   BKE and its affiliates repeatedly praised Kolobov and Yildiz for their operational skills and financial performance.   Based on BKE's recommendation, including specifically the representations regarding Kolobov and Yildiz that Andreas Bork made to HEGO, SGIC contacted Kolobov and Yildiz and began discussions. The parties later entered into a non-disclosure agreement in October of 2013 and signed a term sheet in December 2013. SGIC incurred approximately €600,000 in expenses preparing for the sale of its interests in GRIL.

**I.      BKE Decides to Hand Control of the Berlin Market to Another Party**

30.      BKE wanted some party to purchase the BK Berlin restaurants that were involved in the German insolvency proceeding.  It is unlikely that anyone would purchase the BK Berlin restaurants through the German insolvency proceeding without the ability to acquire the restaurants owned by HEGO and its affiliates.  The restaurants owned by HEGO and its affiliates were profitable.  The BK Berlin restaurants were not profitable.   An operator in Berlin would need both the BK Berlin restaurants and the restaurants owned by HEGO and its affiliates to operate successfully.

31.      Without telling Groenke, SGIC or any of their affiliates, BKE set out to force a sale of the restaurants owned by HEGO and its affiliates on BKE's terms.   SGIC, GRIL and

9

Groenke have now discovered that in October 2013, BKE assembled a presentation for prospective buyers of Burger King restaurants in the same markets that HEGO had its development agreement.  This was the same market region that had been included in HEGO's development agreement.  BKE assembled this presentation without HEGO, GRIL or SGIC's knowledge or approval.  The presentation stated incorrectly that "operator Groenke in [sic] difficulties" and claimed that HEGO was underperforming the market.  The presentation went on to state that BKE was "looking for a strong partner to develop the entire region" and offered the opportunity to purchase the restaurants owned by HEGO and its affiliates, even though BKE had no right to market or sell those restaurants.  The presentation stated that BKE was offering "attractive terms" and "development agreements."  This presumably referred to the markets within the development agreement formerly held by HEGO that BKE improperly terminated.

32.     In December 2013, the BK Berlin restaurants were sold to Baum through the German insolvency proceeding. About the same time, Baum was also awarded an exclusive development agreement for Berlin.  Baum's development agreement consisted of the same markets in which HEGO and its affiliates operated their restaurants.

33.     It is unlikely that Baum would have purchased the BK Berlin restaurants through the German insolvency proceeding without an implicit promise from BKE that Baum would acquire the restaurants owned by HEGO and its affiliates.  The restaurants owned by HEGO and its affiliates were profitable.  The BK Berlin restaurants were not profitable.

**J.     SGIC Enters Into a Contract to Sell its Interests in GRIL**

34.     On April 23, 2014, a Share Purchase Agreement was entered into between SHOKOIP Limited, as the purchaser, SGIC as seller and GRIL as the Company. SHOKOIP was a company owned and controlled by Yildiz and Kolobov.  Yildiz and Kolobov were originally

suggested by Boch as suitable buyers.  BKE, however, suddenly took the position that a sale to Kolobov and Yildiz or any entity associated with them could not proceed.  On March 19, 2014, BKE sent a letter to GRIL claiming, incorrectly, that it had not received any specific information regarding the proposed sale of SGIC's equity interest in GRIL.  BKE also claimed, again incorrectly, that any sale of SGIC's equity interest in GRIL required BKE's prior consent under the franchise agreements held by HEGO and its affiliates.  BKE implicitly threatened to terminate the franchise agreements if SGIC proceeded with the sale of its equity interest in GRIL.

**K.     BKE's Interpretation of the Franchise Agreements is Wrong**

35.     The franchise agreements do not require BKE's consent to a sale of the equity interests in GRIL.  The franchise agreements merely provide that HEGO may not sell, transfer, convey, assign or license any rights or entitlements to the restaurants owned by HEGO and its affiliates or to the assets necessary to the operation of those restaurants.

36.     The franchise agreements state that if HEGO intends to sell one or more of the Restaurants, it must give written notice of its intention to sell to BKE and provide details about the prospective buyer.  Nothing in the franchise agreements, however, requires HEGO to reveal the purchase price to BKE.  The information supplied by HEGO would then be used by BKE to determine whether prospective buyer will be approved based on criteria typically applied by BKE; namely, the general requirements that BKE imposes on its franchisees.  The franchise agreements expressly state that general business knowledge of the trade, credit worthiness, integrity and business experience are criteria that BKE uses to assess whether to approve an entity as a franchisee.

37.     The franchise agreements provide that BKE shall have 21 days following its receipt of the information concerning the prospective buyer to decide whether (1) BKE will approve the sale or (2) whether BKE chooses to exercise a right of first refusal to purchase the Restaurants itself or have the Restaurants purchased by a third party designee.

38.     The franchise agreement further provides that if BKE does not respond to HEGO's notice of its intention to sell within 21 days, HEGO shall have the right to sell the restaurant provided the prospective purchaser is qualified to be a franchisee in the Burger King European system.   Nowhere in the franchise agreement is there any requirement that BKE's consent to a sale of the equity interests in an upstream parent of the franchisee.

**L.     BKE Pressures Kolobov and Yildiz**

39.     On March 25, 2014, BKE sent a letter to Yildiz claiming that any agreement to purchase SGIC's equity interest in GRIL violated existing franchise agreements between BKE and the Burger King franchisee owned and controlled by Kolobov and Yildiz.   BKE claimed it had a right of first refusal on any Burger King restaurant that Kolobov and Yildiz or any entity that controlled might seek to acquire.   BKE stated that it "is not currently approving any new franchisees in Germany" and, therefore, any new entity that Kolobov and Yildiz formed would not be approved under any circumstances.   As it did with SGIC, BKE implicitly threatened to terminate the franchise agreements of the Kolobov and Yildiz franchisees if they proceeded with the acquisition of the GRIL shares by SHOKOIP.

40.     BKE also pressured Kolobov and Yildiz to deliver the share purchase agreement between SGIC and SHOKOIP.   The share purchase agreement contained the material terms of SHOKOIP's acquisition of the equity interest in GRIL, including the purchase price.   At that point, BKE was not aware of the price that SGIC and SHOKOIP had agreed to in connection

12

with the sale of the equity interest in GRIL.  BKE most likely wanted the share purchase agreement to undermine the acquisition of GRIL by SHOKOIP.

41.     On April 15, 2014, Kolobov and Yildiz sent a letter to BKE denying that their franchise agreements prohibited the acquisition of the GRIL shares by SHOKOIP without BKE's consent.  Kolobov and Yildiz also refused to give in to BKE's demands to turn over the share purchase agreement.  Kolobov and Yildiz invited BKE to either purchase the shares in GRIL itself or confirm that BKE had no objections to the acquisition of GRIL by SHOKOIP.

**M.      SGIC Offers BKE a Right of First Refusal**

42.     On April 25, 2014, SGIC sent a letter to BKE.  The purpose of the letter was two-fold.  One, SGIC responded to the letter SGIC received from BKE on March 19, 2014, in which BKE claimed that the franchise agreements required its consent to the sale of SGIC's interests in GRIL.  Two, SGIC offered BKE a right of first refusal on the interest in GRIL, even though it had no contractual or legal obligation to do so.  BKE did not agree to buy the SGIC's shares in GRIL.

**N.      The Wallraff Report Nearly Destroys the German Market and Yi-Ko**

43.     On April 28, 2014, an investigate reporter program known as "Team Wallraff – Reporter Undercover" (the "Wallraff Report") ran on German television.  In it, a team of reporters worked undercover as employees of Burger King restaurants owned by Yi-Ko.  These reporters used hidden cameras to film conditions inside the Yi-Ko restaurants.  The reporters went out of their way to depict the Yi-Ko Burger King restaurants as unsanitary and generally portrayed working conditions as poor.  The Wallraff Report almost killed Burger King sales across Germany.  Revenue declined by 30% on average for most franchised restaurants.

44.     BKE used the Wallraff Report as an opportunity to further interfere with the sale of the GRIL interests to SHOKOIP.  BKE also used the Wallraff Report as an opportunity to interfere with Yi-Ko's operation of its restaurants.  Among other things, BKE replaced Yi-Ko's management with its own employees.  As a result, BKE effectively began operating the Yi-Ko restaurants.

45.     On May 11, 2014, Cil contacted Groenke and informed him that, because of the negative publicity associated with Yi-Ko, no entity in which Yildiz was involved would be approved as a buyer of any restaurants or related interests.  Groenke noted that BKE had replaced Yi-Ko's management with its own employees who were now operating the Yi-Ko restaurants.  Groenke asked how BKE could take the position that Yi-Ko was not qualified to operate Burger King restaurants in Germany when *BKE itself* was operating Yi-Ko.  Cil had no answer.

46.     Cil was almost certainly required to take this illogical position because BKE had previously promised the restaurants owned by HEGO and its affiliates to Baum.  The restaurants owned by HEGO and its affiliates are profitable.  The BK Berlin restaurants were not profitable.  Baum would need both the BK Berlin restaurants and the restaurants owned by HEGO and its affiliates to operate successfully in the Berlin market.

**O.     SHOKOIP Refuses to Proceed**

47.     On May 20, 2014, Yi-Ko, on behalf of SHOKOIP, sent written notice to SGIC that it was unable to proceed with the closing of the acquisition of the GRIL interests. SHOKOIP made it clear that BKE had threatened it with the loss of its franchise agreements and development agreements if it moved forward with the acquisition.

48789739.1

## CAUSES OF ACTION

### Count 1: Tortious Interference with Existing Contract

48.     Plaintiffs incorporate by reference the allegations contained in paragraph 8 through 47 as if fully set forth herein.

49.     The Plaintiffs had a valid and enforceable Share Purchase Agreement with SHOKOIP.

50.     BKE willfully and intentionally interfered with the contract.

51.     BKE's interference proximately caused the Plaintiffs' injury.  As a proximate cause of BKE's interference, the Plaintiffs suffered actual damage or loss.

### Count 2: Tortious Interference with Prospective Contract

52.     Plaintiffs incorporate by reference the allegations contained in paragraph 8 through 47 as if fully set forth herein.

53.     In the alternative, to the extent that the Share Purchase Agreement is not an existing contract, in the alternative, there was a reasonable probability that the Plaintiffs would have entered into a business relationship with SHOKOIP or another third person.

54.     BKE intentionally interfered with that relationship.

55.     BKE's conduct was independently tortious or unlawful.

56.     BKE's interference proximately caused the Plaintiffs' injury. As a proximate cause of BKE's interference, the Plaintiffs suffered actual damage or loss.

### Count 3: Request for Declaratory Relief – Absence of BKE Consent Rights

57.     Plaintiffs incorporate by reference the allegations contained in paragraph 8 through 47 as if fully set forth herein.

48789739.1

58.     There is a substantial and continuing controversy between Plaintiffs and BKE regarding the interpretation of the franchise agreements governing the restaurants owned by HEGO and its affiliates.  Plaintiffs allege that the franchise agreements governing the restaurants owned by HEGO and its affiliates do not require or permit BKE's consent to a sale by SGIC of its interests in GRIL.  BKE has taken the position in communications with Plaintiffs that BKE's consent to a sale by SGIC of its interests in GRIL is required by the franchise agreements governing the restaurants owned by HEGO and its affiliates, and that a sale without BKE's consent will result in a breach of the franchise agreements governing the restaurants owned by HEGO and its affiliates.  As a result, SGIC is threatened with the loss of some or all of its equity value in GRIL if it is prevented from selling its interests in GRIL to SHOKOIP or another party in an arms-length transaction.  Likewise, GRIL is threatened with the loss of its equity value in HEGO and its affiliates if BKE terminates the franchise agreements based on a sale by SGIC of its interests in GRIL.

59.     Under 28 U.S.C. § 2201 of the Declaratory Judgment Act, this Court is empowered to issue a declaratory judgment regarding the respective rights of the parties under the franchise agreements governing the restaurants owned by HEGO and its affiliates.   A declaration of rights is both necessary and appropriate to establish that the franchise agreements governing the restaurants owned by HEGO and its affiliates do not require or permit BKE's consent to a sale by SGIC of its interests in GRIL.

**Count 4: Request for Declaratory Relief – BKE's Effective Consent**

60.     Plaintiffs incorporate by reference the allegations contained in paragraph 8 through 47 as if fully set forth herein.

61.     There is a substantial and continuing controversy between Plaintiffs and BKE regarding the interpretation of the franchise agreements governing the restaurants owned by HEGO and its affiliates.   Plaintiffs allege that if the franchise agreements governing the restaurants owned by HEGO and its affiliates give BKE the right to consent to a sale by SGIC of its interests in GRIL, BKE effectively consented to the sale by SGIC of its interests in GRIL. The franchise agreements provide that BKE shall have 21 days following its receipt of the information concerning a prospective buyer to decide whether (1) BKE will approve the sale or (2) whether BKE chooses to exercise a right of first refusal to purchase the restaurant itself or have the restaurant purchased by a third party designee.   The franchise agreements further provide that if BKE does not respond to a notice of its intention to sell within 21 days, the franchisee shall have the right to sell the restaurant provided the prospective purchaser is qualified to be a franchisee in the Burger King European system.

62.     SGIC gave notice of its intent to sell its interests in GRIL to BKE.   BKE did not respond to such notice within 21 days.   To the extent the franchise agreements governing the restaurants owned by HEGO and its affiliates give BKE the right to consent to a sale by SGIC of its interests in GRIL, BKE did not respond within 21 days.   SHOKOIP was qualified to be a franchisee in the Burger King European system. As a result, BKE has effectively consented to the sale by SGIC of its interests in GRIL to SHOKOIP.

63.     Under 28 U.S.C. § 2201 of the Declaratory Judgment Act, this Court is empowered to issue a declaratory judgment regarding the respective rights of the parties under the franchise agreements governing the restaurants owned by HEGO and its affiliates.   A declaration of rights is both necessary and appropriate to establish that BKE effectively consented to the sale by SGIC of its interests in GRIL.

48789739.1

WHEREFORE, Plaintiff prays for a judgment against BKE for damages, including but not limited to actual, special and consequential damages, together with pre-judgment interest and post-judgment interest as permitted by law and costs, a declaration concerning the parties' respective rights under the franchise agreements governing the restaurants owned by HEGO and its affiliates, and further relief as the Court deems just and proper.

Dated:  September 12, 2014

Respectfully submitted,

*/s/ James H. Billingsley*
James H. Billingsley
State Bar No. 00787084
Leane Kathleen Capps
State Bar No. 00796301
Daniel D. McGuire
State Bar No. 24081282

POLSINELLI PC
2501 N. Harwood Street
Suite 1900
Dallas, Texas 75201
jbillingsley@polsinelli.com
lcapps@polsinelli.com
dmcguire@polsinelli.com
Telephone:  (214) 397-0030
Facsimile:  (214) 853-9199

**ATTORNEYS FOR PLAINTIFFS**

48789739.1